United States District Court
Southern District of Texas
**ENTERED**
January 22, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOUSTON REFINING LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| UNITED STEEL, PAPER AND | § | CIVIL ACTION NO. H-12-2416 |
| FORESTRY, RUBBER, MANUFACTURING, | § | |
| ENERGY, ALLIED INDUSTRIAL AND | § | |
| SERVICE WORKERS INTERNATIONAL | § | |
| UNION, et al., | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the court on January 11, 2016. After considering the Joint Pretrial Order (Docket Entry No. 51), the Joint Proposed Findings of Fact and Conclusions of Law (Docket Entry No. 60), the evidence at trial, and the parties' arguments, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).

## FINDINGS OF FACT

### Relationship of the Parties

1.    Plaintiff Houston Refining, L.P. ("the Company" or "Houston Refining") operates a refinery in Houston, Texas.

2.    Houston Refining, L.P. is a wholly-owned subsidiary of LyondellBasell Industries, N.V.

3.     Defendant  United  Steel,  Paper  and  Forestry,  Rubber, Manufacturing,  Energy,  Allied  Industrial  and  Service  Workers International Union ("USW") is a labor organization as defined in § 2(5)  of  the  National  Labor  Relations  Act  ("NLRA"),  29  U.S.C. § 152(5).

4.     Defendant USW Local 13 227 ("Local 13 227") is also a labor organization as defined by the NLRA.

5.     Defendants  USW  and  Local  13  227  (collectively,  the "Union") are, and at all times relevant to this case have been, the exclusive  representative  of  hourly  paid  employees  at  Houston Refining with the exception of clerical and technical employees and any  hourly  paid  executive,  administrative,  and  professional employees.   Unless otherwise specified in these Findings of Fact and  Conclusions  of  Law,  references  to  "employees"  mean  those individuals employed at Houston Refining who are represented by the Union.

## Collective Bargaining Between the Parties and the Presumed 2009 Collective Bargaining Agreement ("CBA")

6.     Houston  Refining  collectively  bargains  with  the  Union over  wages,  hours,  and  terms  and  conditions  of  employment  for  the Company's employees.

7.     Terms  agreed  to  in  negotiations  have  been  set  forth  in CBAs that typically have a three-year term.

8.     The CBA that immediately preceded the events giving rise to  this  case  began  on  February  1,  2006,  and  was  set  to  expire  at

midnight on January 31, 2009 (the "2006 CBA").  (Company Ex. 1)
The parties agree that timely notice was given of intent to cancel
the 2006 CBA in accordance with § 8(d) of the NLRA.

9.     In mid-December of 2008 the Union and Houston Refining
met to discuss plans for negotiating their next labor contract.

10.    Formal negotiations began in early January 2009.

11.    Each party designated a negotiation team, with Joe Wilson
of the USW serving as lead negotiator for the Union and William
("Bill") Teufel as lead negotiator for the Company.

12.    The parties could not reach an agreement for the next CBA
by the midnight January 31, 2009, expiration date of the 2006 CBA.

13.    The Union proposed that the parties enter a rolling
24-hour extension agreement to extend the 2006 CBA while
negotiations continued.

14.    Houston Refining accepted this proposal and the Union
drafted a rolling 24-hour extension.

15.    On January 31, 2009, the Union and the Company signed the
extension agreement ("rolling 24-hour extension") extending the
2006 CBA "on a day-to-day basis subject to a 24-hour notice of
canceling the extension."  (Company Ex. 8)

16.    The rolling 24-hour extension did not require any
particular form of notice to cancel it, only a 24-hour notice.

17.    With the rolling 24-hour extension in place negotiations
continued into February of 2009; and the parties reached a

tentative Memorandum of Agreement ("MOA") on February 12, 2009. (Union Ex. 3)

18.   A condition to the MOA going into effect was ratification by the Union members employed at Houston Refining.

19.   The MOA was signed by the Company, the Local Union, and International Union representative Joe Wilson.  (Union Ex. 3)

20.   The credible evidence establishes that in discussions about the MOA Joe Wilson told Bill Teufel that the rolling 24-hour extension would terminate when the membership ratified the MOA.

21.   On February 19, 2009, Union members voted to ratify the MOA.

22.   Joe Wilson notified Bill Teufel that the members had ratified the MOA.

23.   Upon ratification of the MOA on February 19, 2009, the rolling 24-hour extension terminated and the parties acted according to the newly ratified MOA, which became the presumed new collective bargaining agreement (the "presumed 2009 CBA").

24.   Within days after ratification of the presumed 2009 CBA, the Company began making changes to terms and conditions of employment of the Union members consistent with the presumed 2009 CBA and differing from the 2006 CBA.  (Company Exs. 16, 17, 19)

25.   The parties ceased operating under the provisions of the rolling 24-hour extension.

26.   The Union participated and fully cooperated in the implementation of the new terms and conditions of the presumed 2009

CBA and did not object to, or grieve, the changes.   (Company Exs. 21, 22)

27.   After February 19, 2009, the parties operated under the provisions of the presumed 2009 CBA, which they believed had replaced the 2006 CBA.

**Houston Refining's 401(k) Plan**

28.   Article 40 of the 2006 CBA addresses employee benefits. (Company Ex. 1, page HRO.000055)

29.   The 401K And Savings Plan For Represented Employees ("401(k) Plan") is one of several employee benefit plans identified in Article 40 of the 2006 CBA.   (Company Ex. 1, page HRO.000061)

30.   Details concerning the various benefit plans referenced in the 2006 CBA, including the 401(k) Plan, are set forth in separate plan documents in accordance with the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.

31.   The 401(k) Plan was implemented by Houston Refining, without negotiation with the Union, on July 1, 1995.   (Company Ex. 4, page HRO.000200)

32.   The 401(k) Plan is a typical employee retirement benefit plan enabling employees to make pre-tax and post-tax contributions to a fund administered in accordance with federal law and regulations.

33.   The funds of the 401(k) Plan are invested in a variety of products such as mutual funds, treasuries, money market funds, and

bond funds, selected from a menu of investment choices by each employee-participant.

34.   Maximum annual contribution amounts are prescribed in the Internal Revenue Code and penalties apply to withdrawal of funds by participating employees before reaching age 59.5.

35.   The governing plan document, as well as the summary plan description provided to all employee participants in the 401(k) Plan, states that Houston Refining can unilaterally change the terms of the 401(k) Plan at any time.  (Id., page HRO.000250.)

36.   Houston Refining unilaterally made several changes to terms of the 401(k) Plan since 1995.  (Company Exs. 2, 3, 33)

37.   The language of Article 40 of the 2006 CBA, the CBA that USW now contends existed when it filed Grievance No. 0-12-09 (the "Grievance") that gave rise to this action states:

> During the term of this Agreement, [Houston Refining] will provide advance notice of proposed changes to the benefit plans covered by the Agreement.  [Houston Refining] will meet with the Union for the purpose of explaining and discussing the proposed changes.
>
> A reasonable time period will be provided for the Union to elect inclusion in or exclusion from the amended benefits plan.  If the Union elects exclusion, represented employees shall continue participation in the existing, unchanged benefits plan for the term of the Collective Bargaining Agreement.

(Company Ex. 1, HRO.000062-000063)   The above language remained unchanged in the presumed 2009 CBA and each successor CBA.

38.   Houston Refining amended and restated the 401(k) Plan on December 15, 2008.  (Company Ex. 4, page HRO.000193)

-6-

39.   Neither the Company nor the Union made any proposals concerning the 401(k) Plan during the negotiations for the 2009 CBA, but at the first negotiations meeting the Company stated that it might make such a proposal.

## The LyondellBasell Bankruptcy and 401(k) Match Suspension

40.   On January 6, 2009, Lyondell Chemical Company and some affiliated business entities, including Houston Refining, filed for bankruptcy protection.   In re Lyondell Chemical Company, et al., Case No. 09 10023 (REG), United States Bankruptcy Court for the Southern District of New York (the "Lyondell Bankruptcy").

41.   On March 6, 2009, Houston Refining notified the Union that because of the Company's recent Bankruptcy filing and the resultant need to conserve cash, the Company had decided to suspend matches to employee contributions to its 401(k) Plan beginning with the May payroll.   (Company Ex. 20)

42.   Houston Refining's suspension of the matching 401(k) contributions was consistent with all of the other LyondellBasell companies that filed for bankruptcy.   (Company Ex. 6; Union Ex. 4)

43.   Before May of 2009 Houston Refining matched the elective deferrals made by employees under the salary reduction agreement in the 401(k) Plan.

44.   This was a dollar-for-dollar match up to a maximum of 8% of the participating employee's base wages; thus, for example, if an employee whose base annual wages were $70,000.00 contributed the

full amount allowed by law to her 401(k) account, Houston Refining would contribute an equal amount not to exceed $5,600.00.

45.   Funds deposited as matching contributions by the Company are not correlated to hours of work or productivity.  Further, job assignments and employment status of employees are not related to or affected by 401(k) matching contributions made by the Company.

46.   The matching contributions are deposited into the employees' individual 401(k) accounts, but are not paid to the employee, nor are they available to the employee without penalty until reaching retirement age as defined in the Internal Revenue Code.

47.   Matching contributions are not taxable income to employees and there is no payroll withholding from the matching contributions at the time they are made, but the elected deferrals and matching contributions are taxed upon withdrawal.

48.   Neither federal nor state law requires that any employer make 401(k) contributions on an employee's behalf.  Further, there are no state or federal laws related to compensation of employees that include matching contributions made by an employer in calculations of "regular rate of pay," "overtime," "minimum wage," or any other wage related calculations.

**The Dispute Nullifying the 2009 CBA and Subsequent Proceedings**

49.   In March of 2009, after the Company informed the Union that it would suspend the 401(k) match, the parties began

-8-

discussing whether or not a 2001 letter agreement ("LOA") prohibiting strikes, lockouts, and other work slowdowns during the life of the CBAs, was supposed to be included in the 2009 CBA, with the Union taking the position that the LOA was not to be included.

50. Houston Refining disagreed and directed the Union to a February 5, 2009, side agreement between the parties that clearly stated all LOAs and similar agreements would remain in effect with the new contract. (Company Ex. 10)

51. On May 11, 2009, the Union submitted the Grievance to Houston Refining. (Company Ex. 23) When the Grievance was filed by the Union, both the Union and Houston Refining believed that the presumed 2009 CBA was in effect.

52. A grievance under the 2006 CBA is defined by Article 30 to be "any difference regarding wages, hours or working conditions between the parties . . . covered by this Agreement." (Company Ex. 1, page HRO.000049)

53. Set forth immediately below is a reproduction of the language in the Grievance as it appears in the document, Company Ex. 23:

**Nature of Grievance**

**The Union charges Lyondell-Houston Refiners LP with a specific violation of the Article{s} 40, Section 6.3 & 6.4 & the "No Retrogression" LOA from NOBP and <u>any</u> other provisions of the agreement that may be found to apply.**

**State what happened:**

**On _May_ 7, 2009, the Company unilateral terminated of the 401(k) match for represented employees. This is a violation of the following CBA language:**

**6.4.    During the term of this Agreement, the Company will provide advance notice of proposed changes to the benefit plans covered by the Agreement.**

> **6.4.1.    The Company will meet with the Union for the purpose of explaining and discussing the proposed changes.**
> **6.4.2.    A reasonable time period will be provided for the Union to elect inclusion in or exclusion from the amended benefits plan.**
> **6.4.3.    If the Union elects exclusion, represented employees shall continue participation in the existing, unchanged benefits plan for the term of the Collective Bargaining Agreement.**

**plus the "No Retrogression" LOAs that were extended with each term of the Collective Bargaining Agreement since 1993 with tho following language:**
**February 9, 1993**

> **No Retrogression:  The Company agrees that there shall be no retrogression in previous terms and conditions, including but not limited to agreements on no layoffs, rate retention, plant closure, health and safety clauses, pension review and health and safety review.**

54.    The section references in the Grievance are identical to the section references in the presumed 2009 CBA.  For example, the Grievance alleges a "specific violation of the Article(s) 40, Section[s] 6.3 & 6.4 . . . ."  The presumed 2009 CBA has sections numbered in this manner; the 2006 CBA does not.  The quoted language from the presumed 2009 CBA is identical to the Article 40 language in the 2006 CBA but with different section numbers.  At trial, Houston Refining agreed that quoting the text of the presumed 2009 CBA did not affect the validity of the Grievance, i.e., that the wording of the Grievance did not invalidate it.

55.    On May 13, 2009, Joe Wilson wrote Houston Refining to advise that the International Union's officers refused to sign the

presumed 2009 CBA, even though Wilson previously signed off on the February 12, 2009, MOA as a representative of the International Union.  (Union Ex. 5)

56.   That same day the Union filed Charge No. 16-CA-26791, alleging to the National Labor Relations Board ("NLRB") Region 16 that Houston Refining violated section 8(a)(5) of the NLRA when it suspended 401(k) matching contributions.  (Company Ex. 25)  Houston Refining rejected the Grievance, asserting that it did "not raise any grievable issue under the Collective Bargaining Agreement." (Company Ex. 26)  The Union amended this charge on June 2, 2009, to add Houston Refining's refusal to process the Grievance as a separate violation of § 8(a)(5).  (Company Ex. 27)

57.   On June 12, 2009, Houston Refining filed Charge No. 16-CB-07895 with Region 16 of the NLRB, alleging that the Union violated § 8(b)(3) of the NLRA by refusing to execute the presumed 2009 CBA.  (Company Ex. 28)

58.   On July 31, 2009, the Regional Director of the NLRB dismissed Houston Refining's charge by declining to issue a complaint.  (Company Ex. 29)  Houston Refining appealed that decision to the NLRB Office of the General Counsel in Washington, D.C.

59.   On October 30, 2009, the NLRB Office of the General Counsel denied the Company's appeal regarding Charge No. 16-CB-07895.  (Company Exs. 35, 36)

60.   The General Counsel determined that there was no meeting of the minds regarding the presumed 2009 CBA because an agreement

had not been reached on "all substantive issues and material terms." (Company Ex. 35)

61.  The term in dispute as determined by the General Counsel was the no strike/no lockout/no slowdowns provision.

62.  On November 13, 2009, the Union filed a Complaint in the Lyondell Bankruptcy proceeding in the Southern District of New York seeking to compel Houston Refining to arbitrate the 401(k) dispute. (Company Ex. 37)

63.  The Union represented to the Bankruptcy Court that the "2009 agreement is currently in effect," and articulated the 2009 CBA as the basis for compelling Houston Refining to arbitrate the 401(k) dispute.  (Id., page HRO.000655.)

64.  This representation was consistent with other representations by the Union regarding the "effective" nature of the 2009 CBA, including an August 31, 2009, letter to Terrence Martin, in which Joe Wilson confirmed Martin's characterization of the 2009 CBA as "effective." (Company Ex. 31)

65.  On November 18, 2009, the NLRB dismissed the Union's Charge (i.e., Charge No. 16-CA-26791). (Company Ex. 39)

66.  The NLRB's reasoning behind dismissal of the Union's Charge was contained in an Advice Memorandum from the NLRB Division of Advice dated November 9, 2009, and transmitted to Houston Refining's counsel on November 18, 2009.  (Company Ex. 38)

67.   Specifically, the NLRB determined that the Union waived its right to request bargaining over Houston Refining's match suspension.  (Id., page HRO.000641.)

68.   The NLRB also noted that "since the parties had not reached a meeting of the minds on a successor agreement when the Employer suspended benefits, there was no contract modification and it is immaterial whether the Employer had a 'sound arguable basis' under the expired contract for its action."  (Id. at n.1.)

69.   Throughout the NLRB proceedings the Union did not allege that the 2006 CBA could serve as a contractual duty to arbitrate because of the rolling 24-hour extension.  The Union's charge was based on alleged unilateral change to and refusal to process the grievance under the presumed 2009 CBA that the parties believed was in effect.

70.   In its December 18, 2009, answer to the Union's complaint in the bankruptcy litigation, relying on the NLRB's previous determination that the 2009 CBA never existed, Houston Refining raised the non-existence of the 2009 CBA as the reason it did not have to arbitrate the 401(k) dispute.  (Company Ex. 40, page HRO.001144)

71.   On January 20, 2010, the parties, recognizing that the presumed 2009 CBA was not in place, executed a new collective bargaining agreement that expired January 31, 2012 ("the 2010 CBA").  (Company Ex. 45)  The 2010 CBA states that

> [a]ctions taken by the company and union to implement the terms of the original tentative agreement dated February 12, 2009 (such as, POS/PPO, Machinist/Refinery Mechanics) prior to the signing of this letter will remain unchanged. The Parties, however, agree that this provision does not in any way make the collective bargaining agreement effective on any date earlier than the date which it is signed by the Union.

(Id.)

72. On February 20, 2010, the Union informed the Company that it intended to amend its Complaint in the Bankruptcy Court to include an alternative allegation that the Company had an obligation under the 2006 CBA to arbitrate the Grievance based on its contention that neither party had cancelled that rolling 24-hour extension. (Union Ex. 6)

73. The Company refused to consent to the requested amendment.

74. On April 23, 2010, in a Motion for Leave to Amend its Complaint, the Union argued that the rolling 24-hour extension was never cancelled as an alternative to the 2009 CBA. (Company Ex. 46, page 3)

75. Leave to amend the Complaint was granted by the Bankruptcy Court on September 13, 2010. (Union Ex. 7)

76. At the urging of the Bankruptcy Judge, the parties ultimately resolved the Union's Bankruptcy Court Complaint by agreeing to arbitrate the dispute, preserving all arguments and defenses.

**Labor Arbitration and the Instant Lawsuit**

77. Following the settlement in the Bankruptcy Court, the Grievance was heard by Arbitrator Charles Griffin, on February 23-24, 2012.

78. On June 15, 2012, the Arbitrator issued an Opinion and Award sustaining the Union's Grievance. (Union Ex. 8)

79. On August 10, 2012, the Company filed suit to vacate Arbitrator Griffin's Award in its entirety. (Docket No. 1)

80. By Memorandum Opinion and Order (Docket No. 20) entered on June 14, 2013, this Court denied Houston Refining's Motion for Summary Judgment and granted in part and denied in part the Union's Motion for Summary Judgment.

81. Houston Refining filed a timely Notice of Appeal (Docket No. 23) on July 12, 2013.

82. By Order on August 6, 2013 (Docket No. 29), the Court stayed remand to Arbitrator Griffin pending appeal to the Fifth Circuit.

83. On August 25, 2014, the Fifth Circuit remanded to this Court for further proceedings to determine if the Union's Grievance over Houston Refining's suspension of 401(k) matching contributions was arbitrable. See Docket Entry No. 32, Houston Refining, L.P. v. United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, 765 F.3d 396, 410 (5th Cir. 2014). The Fifth Circuit explained that

resolving this issue would be fact intensive, and would require the court to address three issues:

(1) "[W]hether the 2006 CBA existed when the Union filed its grievance." <u>Id.</u>

(2) Whether even if the 2006 CBA existed, the grievance was "invalid under the 2006 CBA's arbitration clause" because it quoted the text of the presumed 2009 CBA. <u>Id.</u> at 411.

(3) Whether even if the 2006 CBA existed, the "unilateral suspension of the 401(k) Plan, allegedly in violation of Article 40 of the 2006 CBA, does not concern wages withing the meaning of the CBA's arbitration clause." <u>Id.</u>

The Fifth Circuit instructed that these issues must be decided, "'independently,' without deference to the arbitral decision." <u>Id.</u> at 411.

84. As explained in Finding of Fact 54, the second issue is no longer in dispute because the Company now agrees that the wording of the Grievance did not affect its validity.

## <u>CONCLUSIONS OF LAW</u>

1. The court has personal jurisdiction over the parties, all of whom are either residents within the Southern District of Texas, Houston Division, or exceed the level of minimal contacts for exercise of personal jurisdiction in Harris County, Texas.

2. The court has subject matter jurisdiction under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). See <u>Textron Lycoming Reciprocating Engine Division, AVCO Corp. v.</u> <u>United Automobile, Aerospace & Agricultural Implement Workers of</u>

America, International Union, 118 S. Ct. 1626, 1629 (1998) (allegation of labor contract violation sufficient to support subject matter jurisdiction under Section 301(a)).

3.   Whether an agreement to arbitrate exists, on which a claim of breach can arise, is a question of law for the Court to decide.  See Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80, 605 F.2d 1290, 1294 (2d Cir. 1979).

4.   The party asserting arbitrability, here the Union, bears the burden of proving that an agreement to arbitrate exists.  Adkins v. Labor Ready, Inc., 303 F.3d 496, 500-01 (4th Cir. 2002).

5.   There is no obligation to arbitrate absent a written agreement, executed by the parties, that requires arbitration of the particular matter.  Litton Financial Printing Division v. NLRB, 111 S. Ct. 2215, 2225 (1991).  See AT&T Technologies, Inc. v. Communications Workers of America, 106 S. Ct. 1415, 1418 (1986) ("'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 80 S. Ct. 1347, 1353 (1960)).

6.   "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability."  AT&T Technologies, 106 S. Ct. at 1419.  The presumption in favor of arbitration applies to the question of whether a particular dispute falls within an existing agreement's scope, but not to the threshold question as to the existence of an agreement between the parties to arbitrate.

-17-

*Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (per curiam).  "Doubts should be resolved in favor of coverage."  *Houston Refining, L.P. v. United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union*, 765 F.3d 396, 412 (5th Cir. 2014) (quoting *AT&T Technologies*, 106 S. Ct. at 1419).

7.    Although there is a presumption of arbitrability when the contract contains an arbitration clause, if it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the presumption does not apply.  *Id.*

8.    Even where there is an agreement to arbitrate, a court can only compel arbitration of a matter that the parties specifically agreed to arbitrate.  *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 266 (5th Cir. 2015) (citing *Safer v. Nelson Financial Group, Inc.*, 422 F.3d 289, 293 (5th Cir. 2005) ("In order to [compel arbitration] we must decide: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.")).

9.    Parties to a collective bargaining agreement can articulate the manner in which it will be terminated.  *See*, *e.g.*, *New York News Inc. v. Newspaper Guild of New York*, 927 F.2d 82, 84 (2d Cir. 1991) (per curiam).  The parties to the rolling 24-hour extension could therefore decide how to cancel it.

10.  Parties to a collective bargaining agreement can communicate the termination of a contract, or its modification, simply by their behavior. <u>International Brotherhood of Electrical Workers, Local No. 12 v. A-1 Electric Service, Inc.</u>, 535 F.2d 1, 4 (10th Cir.), <u>cert. denied</u>, 97 S. Ct. 94 (1976).

11.  Arbitration clauses in collective bargaining agreements generally do not survive expiration of the collective bargaining agreement.  <u>See</u>, <u>e.g.</u>, <u>Litton Financial</u>, 111 S. Ct. at 2225.

12.  Reviewing the issue of arbitrability independently, without deference to Arbitrator Griffin, the court concludes that the Union failed to satisfy its burden to prove that Houston Refining and the Union were parties to an agreement requiring the parties to arbitrate  the dispute over suspension of 401(k) matching contributions.  <u>See</u> <u>AT&T Technologies</u>, 106 S. Ct. at 1418 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

13.  The presumed 2009 CBA cannot serve as the basis for the Union's assertion of a duty to arbitrate the parties' dispute over suspension of the 401(k) matching contributions because "[t]he 2009 CBA never took effect. . ."  (<u>E.g.</u>, Joint Pretrial Order, Docket Entry No. 51, Admission of Fact 15 at p. 7)

14.  The 2006 CBA cannot serve as the basis for the Union's assertion of a duty to arbitrate because the 2006 CBA expired on February 19, 2009 (when the rolling 24-hour extension terminated),

-19-

before the Union filed Grievance No. 0-12-09 on May 11, 2009. <u>See</u>
Findings of Fact ¶¶ 20-27. <u>See</u>, <u>e.g.</u>, <u>Firesheets v. A.G. Building
Specialists, Inc.</u>, 134 F.3d 729, 731 (5th Cir. 1998) (per curiam);
<u>Carpenters Amended & Restated Health Benefit Fund v. Holleman
Construction Co., Inc.</u>, 751 F.2d 763, 767-70 (5th Cir. 1985).

15.   If, however, a higher court were to determine that the
rolling 24-hour extension of the 2006 CBA did not terminate before
the Union filed Grievance No. 0-12-09, the court concludes that the
subject matter of the Grievance is arbitrable under the arbitration
clause of the 2006 CBA, which defines a "grievance" as "any
difference regarding wages, hours, or working conditions."   The
issue before the court is whether the Grievance is arbitrable, and
this court's independent inquiry as to whether the Grievance is
arbitrable

> is circumscribed by a presumption favoring arbitrability:
> [W]here the contract contains an arbitration clause,
> there is a presumption of arbitrability. . . That
> presumption applies unless it may be said with positive
> assurance that the arbitration clause is not susceptible
> of an interpretation that covers the asserted dispute.
> Doubts should be resolved in favor of coverage.

<u>Houston Refining</u>, 765 F.3d at 412 (citing <u>AT&T Technologies</u>, 106
S. Ct. at 1419). <u>See also</u> <u>id.</u> at 413 ("The dissent's analysis of
the 2006 CBA says nothing about whether it may be said with
*positive assurance* that the arbitration clause is not susceptible
of *an interpretation* that covers the asserted dispute.").

16.   The term "wages" as used in § 9(a) of the National Labor
Relations Act, 29 U.S.C. § 159(a), generally encompasses

-20-

contributions to pension plans. See Inland Steel Co., 77 NLRB 1, 4 (1948), aff'd, 170 F.2d 247 (7th Cir. 1948), cert. denied, 69 S. Ct. 887 (1949) ("[W]e are convinced and find that the term 'wages' as used in Section 9(a) [of the National Labor Relations Act] must be construed to include emoluments of value, like pension and insurance benefits which may accrue to employees out of their employment relationship."); id. at 5 ("[T]he respondent's monetary contribution to the pension plan constitutes an economic enhancement of the employee's money wages."). Houston Refining has failed to cite any authority or to present any evidence of the parties' negotiating history showing that the meaning of the term "wages" in the 2006 CBA's arbitration clause differs from the meaning of that term in § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a). Therefore, the court cannot say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the subject of the Union's Grievance. See AT&T Technologies, 106 S. Ct. at 1419 ("[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'") (quoting Warrior & Gulf, 80 S. Ct. at 1352-53). See also Houston Refining, 765 F.3d at 415 n.40 (quoting AT&T Technologies, 106 S. Ct. at

-21-

1419) ("Regardless of what additional facts and legal arguments are marshalled, Houston Refining cannot carry its burden of overcoming the presumption of arbitrability . . . merely by advancing a reasonable reading of the 2006 CBA.  Rather, it must invalidate the Union's interpretation of the CBA's arbitration clause, such that the CBA is not susceptible of *an interpretation* that covers the asserted dispute.").

To the extent that any Finding of Fact is more properly characterized as a Conclusion of Law it is **ADOPTED** as such.  To the extent that any Conclusion of Law is more properly characterized as a Finding of Fact it is **ADOPTED** as such.

**SIGNED** at Houston, Texas, on this 22nd day of January, 2016.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE